

# Missouri Court of Appeals

## Southern District

### Division Two

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | |
| | ) | |
| v. | ) | No. SD32598 |
| | ) | |
| FRANKIE LEE BROWN, | ) | **Filed: Aug. 15, 2014** |
| | ) | |
| Defendant-Appellant. | ) | |

APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable Thomas E. Mountjoy, Circuit Judge

**AFFIRMED**

A jury found Appellant Frankie Lee Brown ("Defendant") guilty of six of ten alleged crimes, and the trial court thereafter sentenced him, as a persistent offender, to life imprisonment for attempted forcible rape, 20 years for first-degree burglary, 15 years for felonious restraint, 15 years for tampering with a motor vehicle, one year for misdemeanor attempted knowingly burning, and 15 days for misdemeanor first-degree trespass.[1] All sentences were concurrent, except for the life sentence, which was ordered to run consecutively to the others.

---

[1] *See* sections 558.011, 558.016, 564.011, 565.120, 566.030, 569.055, 569.080, 569.140 and 569.160. The jury acquitted Defendant of attempted forcible sodomy, third-degree domestic assault, attempted first-degree burglary, and a second count of first-degree trespass. *See* sections 564.011, 565.074, 566.060, 569.140 and 569.160. All references to sections 564.011, 565.074, 565.120, 569.055, 569.140 and 569.160 are to RSMo 2000. Unless otherwise noted, all other statutory references are to RSMo Cum. Supp. 2010.

In this direct appeal of his convictions and sentences, Defendant first contends, "The trial court plainly erred in accepting the jury's verdicts and sentencing [him] . . . because this violated [his] right to due process and effective assistance of counsel[.]"  This claim is based on Defendant's assertions that:  1) he was misinformed that the charges against him "could either run concurrently or consecutively, when, in reality, any conviction on [Count II for attempted forcible rape] would have had to run consecutively to any convictions on" any other counts arising from the same incident; and 2) he would have accepted the State's plea offer of 17 years on Count II and the dismissal of "five of the ten charges" instead of going to trial "had he been correctly informed[.]"

Defendant's second point claims the trial court erred in overruling his motion to suppress statements he made to officers about the alleged crimes and later allowing evidence of the statements to be introduced at trial.  The point maintains that these unspecified "statements" were "presumptively coerced" as an officer "elicited them during a custodial interrogation without first advising [Defendant] of his constitutional rights to assistance of counsel and protection against compelled self-incrimination."  It also claims "[t]he statements were prejudicial because they confirmed that [Defendant] was at M.M.'s ["Victim"] house on other occasions, and that he knew how to get into the house."

Finding no merit in Defendant's claims, we affirm.

### Facts and Procedural Background

Defendant does not challenge the sufficiency of the evidence supporting his convictions, and we accordingly direct our attention to those facts necessary to address his specific complaints on appeal.[2]  In doing so, we review "the evidence presented at trial in the

---

[2] Additional facts relating to the State's plea offers and Defendant's motion to suppress will be set forth within our analysis of the particular point to which they relate.

light most favorable to the verdict[s]." **State v. Strong**, 142 S.W.3d 702, 710 (Mo. banc 2004).

Sometime around March 2011, Defendant and Victim began an intimate, romantic relationship that lasted about two months. Toward the end of that relationship, they "ended up" staying in the home of Victim's mother, where they "started having problems and split up." Victim told Defendant, "you've got to go," but Defendant told her that "he wasn't going to go." Victim obtained an *ex parte* order of protection against Defendant, who left "about a week and a half or so later[.]"

*The June 26th Incident*

On June 26, 2011, at around 1:30 a.m., Victim awoke and heard something downstairs. Her mother and sister were gone, and her children were asleep. Victim "said, 'Who's there?'" Someone replied, "'It's me[,]'" and Defendant "came from the living room. . . . up the stairs . . . into [Victim's] bedroom." Victim told Defendant that he was "not supposed to be here." Victim "kept telling him he needed to leave, and eventually he got angry with [her]." Victim tried to "get to [her] phone[,]" but Defendant grabbed it and put it in his pocket. Defendant did not allow Victim to leave the room.

Victim was trying to get away from Defendant, and they were "all over the room just, you know, fighting." Victim eventually wound up on the floor, and Defendant removed her shorts and underwear. Defendant slapped Victim and bent her hands back. Defendant called Victim "a slut" and "a whore[.]" Defendant touched his penis to the outside of Victim's vagina, but he did not have an erection, and he did not penetrate Victim's vagina. Eventually, Defendant, who Victim believed to be "very intoxicated," "fell to the floor and

3

just did not get back up[.]" At that point (about 4:30 a.m.), Victim "was able to get out of the room and call the police."

Springfield Police Officer Brandon Bowling was dispatched to Victim's address at around 4:40 a.m., where he found Victim standing on the front porch. "She seemed shaken, [and she] appeared as if she'd been crying." Officer Bowling found Defendant lying asleep on Victim's bedroom floor. The officer awakened Defendant and placed him under arrest. As the officer was removing Defendant from the residence, Defendant said that "he was going to kill [Victim]." On the way to the jail, Defendant volunteered a statement to Officer Bowling "along the lines of he's not going down for burglary, even if he's got to kill someone."

After deliberating upon this evidence, the jury found Defendant guilty of attempted forcible rape (Count II), felonious restraint (Count III), and burglary (Count IV). The jury found Defendant not guilty of attempted forcible sodomy (Count I) and third-degree domestic assault (Count V).[3]

*The July 22nd Incident*

On July 22, 2011, Victim was asleep on a couch in her living room in "the early-morning hours" when she awoke to see Defendant "coming through the window on the other side of the room[.]" Defendant was wearing clear "plastic gloves[.]" Victim talked Defendant into going outside, and she called the police when she saw him walk up the street. Based upon this evidence, the jury found Defendant guilty of first-degree trespass (Count VII).

---

[3] The jury also acquitted Defendant of first-degree trespass (Count VI) in connection with an incident that was alleged to have occurred on July 14, 2011.

4

*The July 27th Incident*

Five days later, Defendant knocked on Victim's door, but Victim refused to open it. Victim's sister, A.M., drove up, and she was yelling at Defendant something like, "You need to leave, you're not supposed to be here, just get away." A.M. got inside the house, and the sisters were able to shut the door before Defendant could also get inside. Defendant beat on the door and kicked it; he also banged on the windows. Victim called the police.

A.M. saw Defendant move away from the house, and she saw him kick and beat on the vehicle she had arrived in, a Cadillac Escalade owned by her mother. A.M. also heard Defendant say that he was "going to set [her] truck on fire." Defendant put something in the gas tank, and A.M. saw "a flame." Defendant then ran and "disappeared[.]" After the police arrived, A.M. looked at the vehicle's gas tank and saw "like soot, like ashes, and that the tank was still open."

At trial, A.M. identified photographs that depicted dents in the vehicle that had not been there prior to her arrival. Springfield Police Officer Bradley Shryer testified that he noticed "a wad of notebook paper shoved in the gas port [of the vehicle]. It appeared as if a portion of it had been burned."

Springfield Police Officer Shawn McClure approached the area around Victim's residence (the same address Officer Bowling had responded to on June 26th) at about 10:30 p.m. to assist other officers in looking for the suspect. Officer McClure found Defendant hiding in a bush in the yard of another residence, about five feet away from a dog that was barking at Defendant. Officer McClure handcuffed Defendant and "frisked him for weapons. [He] didn't feel any weapons, but [he] felt what [he] recognized to be a lighter in

5

[Defendant's] right rear pants pocket." Officer McClure had Defendant sit on the curb while other officers interviewed other people located on Victim's street.

At that point, Officer McClure was not sure if Defendant was going to be arrested and taken to jail. Defendant kept asking him, "Why am I being arrested?" Officer McClure began talking to another officer ("Officer Ludwig") who indicated that he was "not for sure if [Defendant was] going to be arrested for property damage or arson." Defendant then said that "he didn't burn anything" and "I didn't even have any notebook paper on me." At that point, no one had said anything in Defendant's presence about notebook paper. Officer Shryer arrested Defendant, then he "searched [Defendant] incident to arrest and . . . pulled out the lighter."

The following day, Springfield Police Officer Chelsea Maslowsky read Defendant his *Miranda*[4] rights and interviewed him at the jail. That interview was recorded on a DVD. State's Exhibit 22, a redacted version of the DVD recording, was admitted into evidence and played for the jury. In the interview, Defendant admitted going to Victim's house on July 27, 2011. He initially denied knowing how A.M.'s vehicle was damaged, but he eventually admitted that he had punched it twice. He also admitted hitting a window of the house.

After deliberating upon this evidence, the jury found Defendant guilty of first-degree tampering (Count IX) and attempted knowingly burning (Count X). The jury found Defendant not guilty of the charge of attempted first-degree burglary related to this incident (Count VIII).

The trial court accepted the jury's verdicts, and Defendant timely filed a motion for new trial. Defendant presented no evidence in support of his claims, electing instead to

---

[4] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

"stand on the motion." The trial court denied the motion for new trial and sentenced

Defendant as described above. This appeal timely followed.

## Analysis

### Point I – The Plea Offers

Defendant's first point claims the "*trial court* plainly erred in accepting the jury's

verdicts and sentencing [Defendant] on all six counts of conviction because this violated

[his] right to due process and effective assistance of counsel" under the "Fifth, Sixth and

Fourteenth Amendments to the U.S. Constitution and Article I, Sections 10 & 18(a) of the

Missouri Constitution" by accepting the jury's verdicts and sentencing him when, for

purposes of memorializing a prior plea offer, Defendant had been incorrectly informed that

any of his sentences "could either run concurrently or consecutively[.]" (Emphasis added).

The following additional facts are relevant to this inventive claim.[5] At a pretrial

hearing in July 2012, the trial court asked if the State had "a plea offer . . . that [it would]

need to make a record on[.]" The assistant prosecutor replied in the affirmative, saying that

the State had initially offered Defendant a plea of 15 years in the Missouri Department of

Corrections ["DOC"], with probation denied, on either the attempted forcible rape or the

attempted forcible sodomy charge, plus guilty pleas "to the other various felony offenses."

---

[5] To the extent that Defendant's point could be read to also claim relief on the ground that his attorney was ineffective, such a claim is not reviewable on direct appeal. **State v. Riley**, 787 S.W.2d 314, 316 (Mo. App. E.D. 1990) ("a claim of ineffective assistance of counsel is not cognizable on direct appeal but must be presented pursuant to the procedure set forth in Rules 29.15 or 24.035 which provide for the development of a full and complete record. These rules provide the exclusive procedure through which post-conviction relief because of ineffective assistance of counsel may be sought"). Defendant also argues that "ineffective assistance of counsel constitutes 'good cause' to grant a new trial[,]" citing **State v. Tinoco**, 967 S.W.2d 87, 90 (Mo. App. W.D. 1998). In **Tinoco**, the trial court denied the defendant's motion for judgment of acquittal, but it sustained the alternative motion for a new trial, and the State was the appealing party. **Id**. at 88. The reviewing court affirmed the trial court's decision to grant a new trial based on ineffective assistance of counsel, finding that Rule 29.15 provided "an exclusive procedure only after, but not prior to, conviction." **Id**. at 89. The defendant in **Tinoco** had not been convicted at the time his motion was heard as he had not yet been sentenced. **Id**. at 90. Therefore, "no judgment of conviction had been rendered, and as such, Rule 29.15 was not yet applicable." **Id**. Here, the trial court accepted the jury's verdicts, denied Defendant's motion for new trial, and sentenced him as earlier noted, making **Tinoco** inapplicable to Defendant's claim.

That previous offer had been revoked when Defendant did not waive his preliminary hearing.

The State subsequently offered a plea of 17 years in DOC, with probation denied, on Count II (attempted forcible rape), 10 years on Count III (felonious restraint), 10 years on Count IV (burglary), "one year on Count V" (third-degree domestic assault), and 10 years on Count IX (first-degree tampering). The State would dismiss the remaining counts, and all of the sentences would run concurrently. In response to these recitations, Defendant confirmed under oath that he was aware of the plea offers, and he said that "they were unacceptable."

During the same proceeding, the assistant prosecutor outlined the range of punishment for each charged offense. Concerning the charges for which Defendant was ultimately found guilty, the assistant prosecutor advised that for attempted forcible rape the range was "life imprisonment, or imprisonment not to be less than five years, in [DOC,]" and he added that a suspended imposition or execution of sentence was not a possibility. The assistant prosecutor advised Defendant that he would be subject to an enhanced sentence of "up to fifteen years in [DOC]" as a persistent felony offender for felonious restraint; an enhanced sentence of up to "thirty years or life in [DOC]" as a persistent felony offender for first-degree burglary, and an enhanced sentence of "up to fifteen years in [DOC]" as a persistent felony offender for first-degree tampering. The assistant prosecutor advised that, "because there is no agreement, if [Defendant] were found guilty of all of these counts, the sentence could be run concurrently on each of these counts, or they could be run consecutively." The assistant prosecutor further advised that if Defendant was convicted of all charged counts, and they were to run consecutively, he was "looking at a maximum

8

punishment of three life sentences with an additional forty-five years in prison on top of that and a combined three years in . . . jail."

Defense counsel did not dispute any of the punishment ranges as outlined by the assistant prosecutor. At the end of the recitation, Defendant confirmed that he understood the range of punishment announced by the assistant prosecutor and that he would not "have the benefit of that plea agreement if" he went to trial and was convicted. Defendant further understood that 17 years was "not any sort of number that the Court [would] be bound by one way or the other[,]" and Defendant confirmed that he still wanted to proceed to trial. The trial court did not make any representations regarding concurrent or consecutive sentences.

To be preserved for appellate review, "[c]onstitutional claims must be made at the first opportunity." *State v. Baxter*, 204 S.W.3d 650, 652 (Mo. banc 2006). Defendant did not complain about the plea offers recitation until he asserted in his new trial motion that he had "received ineffective assistance of counsel" because defense counsel did not advise him that "a sentence of imprisonment imposed for the felony of attempted forcible rape or attempted forcible sodomy must be run consecutively to any sentences imposed for other felonies committed at the same time as the attempted forcible rape or attempted forcible sodomy." Defendant asserted that defense counsel "misinformed Defendant that any sentences imposed could be run concurrently[,]" and Defendant rejected a plea offer of 17 years "based on the incorrect information given to him by counsel regarding the possible range of punishment."

In addition to the fact that the new trial motion alleged no trial court error in connection with the assertion by the prosecutor that any sentences Defendant might receive

9

could run either concurrently or consecutively, the State notes that the motion did not allege a violation of due process or a violation of the Fifth Amendment of the United States Constitution or article I, section 18(a) of the Missouri Constitution. The omission of any such claim deprived the trial court of an opportunity to rule on Defendant's assertion that the procedure violated Defendant's due process rights. Because the claim was unpreserved, Defendant seeks plain-error review.

"[A]n appellate court is not required to engage in plain error review; the decision whether to grant or deny such a request is left to the court's discretion." *State v. Campbell*, 122 S.W.3d 736, 740 (Mo. App. S.D. 2004). If granted, "[p]lain error review involves two steps. First, the court must determine whether the trial court committed an evident, obvious and clear error, which affected the substantial rights of the appellant." *State v. Beggs*, 186 S.W.3d 306, 311 (Mo. App. W.D. 2005). "[E]ven if obvious and clear error is found in the first step of the review, the second step of plain error review requires the court to determine whether manifest injustice or a miscarriage of justice resulted therefrom." *Id.* at 311-12.

Defendant contends that if a trial court is going to permit the State to put its plea offers on the record before a trial, it "must comport with due process, and when the defendant is affirmatively misadvised regarding the plea offer or the range of punishment, his due process rights have been violated[.]" He maintains that "had he been correctly informed" that the sentence on attempted forcible rape "had to run consecutively to any convictions" on other counts arising from the same event, "he would have accepted the State's plea offer . . . and he was prejudiced because he received a life sentence" for attempted forcible rape. *See* section 558.026.1.[6] Presumably, Defendant means that he

---

[6] Section 558.026.1 provides:

would have accepted a 17-year sentence for attempted forcible rape to run *consecutively* with any other sentences for offenses that occurred at the same time. We do not understand Defendant to be arguing that the trial court's duty to afford him with due process would force it to impose a sentence contrary to law.

Defendant acknowledges that the trial court is not required to make a record of plea offers, *see State v. Rose*, 421 S.W.3d 522, 531 (Mo. App. S.D. 2013), but he maintains that "trial courts have started placing plea offers on the record before trial" in response to the United States Supreme Court's decision in *Missouri v. Frye*, 132 S. Ct. 1399, 1408 (2012) (holding counsel ineffective in allowing a plea "offer to expire without advising the defendant or allowing him to consider it"). Defendant argues that "'when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution-and, in particular, in accord with the Due Process Clause[,]'" quoting *Evitts v. Lucey*, 469 U.S. 387, 401 (1985).

This argument fails to appreciate that the trial court in the case at bar did not "opt to act" as Defendant's counsel. Defendant cites no authority in support of his claim that the trial court's failure to act to advise him of the consecutive nature of a sentence in a proposed plea offer constituted "evident, obvious and clear error[,]" and we are not aware of any such authority. What *Frye* established was that a defendant "require[s] effective *counsel* during plea negotiations." 132 S.Ct. at 1407-08 (emphasis added). It is the role of defense counsel,

---

> Multiple sentences of imprisonment shall run concurrently unless the court specifies that they shall run consecutively; except that, in the case of multiple sentences of imprisonment imposed for the felony of . . . forcible rape . . . or an attempt to commit . . . the aforesaid and for other offenses committed during or at the same time as that . . . forcible rape . . . or an attempt to commit . . . the aforesaid, the sentences of imprisonment imposed for the other offenses may run concurrently, but the sentence of imprisonment imposed for the felony of . . . forcible rape . . . or an attempt to commit . . . the aforesaid shall run consecutively to the other sentences.

RSMo 2000. Section 558.026 was amended in 2013 to reword subsection 1 and add offenses.

not the trial court, to fulfill that duty. "[T]he trial court's duties begin when a plea offer is accepted." **Rose**, 421 S.W.3d at 531 (emphasis added); *see also* Rule 24.02(b), (c), and (d). No evident, obvious and clear error by the trial court appears, and this ends our discretionary plain-error analysis of Defendant's claim. Point I fails.

*Point II – The Admission of Defendant's "Statements"*

Defendant's second point contends the trial court committed prejudicial error by overruling his motion to suppress and admitting evidence of his "statements" because they were "elicited . . . during a custodial interrogation[,]" he had not yet been advised of his constitutional rights, and "[t]he statements were prejudicial because they confirmed that [Defendant] was at [Victim]'s house on other occasions, and that he knew how to get into the house."

"The State is prohibited from using statements obtained during custodial interrogation not proceeded by **Miranda** warnings." **State v. Gaw**, 285 S.W.3d 318, 321 (Mo. banc 2009). "When a motion to suppress evidence is denied, and the evidence is offered, the defendant must object at the trial to preserve his contentions for appellate review." **State v. Powers**, 613 S.W.2d 955, 959 (Mo. App. S.D. 1981).

The following additional facts are relevant to this claim. Before the trial began, defense counsel moved *in limine* for the exclusion of testimony by Officer Shryer about statements Defendant had made on the ground that they were hearsay. The prosecutor pointed out that a previous motion to suppress statements had been filed by the defense, but it had then been withdrawn on the date of the suppression hearing.[7] When defense counsel

---

[7] The "**MOTION TO SUPPRESS STATEMENTS**" filed on February 7, 2012 by previous counsel for Defendant sought "to suppress evidence of the statements taken from [D]efendant by law enforcement agents[,]" but it did not identify such agents by name. The motion did not further specify the statements themselves; it simply contended, *inter alia*, that "Defendant's statements were not voluntary[,]" they "were

12

reasserted the suppression motion, the trial court took up the renewed motion outside the presence of the jury during the course of the trial.

For purposes of the suppression motion, Officer Shryer testified that he contacted Defendant on July 27th after he had spoken with Victim and A.M. Defendant was in handcuffs at the time, and he was seated on a street curb. Defendant "was not free to go[.]" When Officer Shryer began speaking with Defendant, he did not read him a *Miranda* warning. Officer Shryer testified that he had received Victim and A.M.'s "side of the story" and he "was giving [Defendant] an opportunity to volunteer his side."

Officer Shryer testified that Defendant "initially made a statement" that "he didn't do anything, and he just wanted to go home." The officer then provided the following testimony:

Q. What did you say?

A. I asked a simple, generic, open-ended question such as: What's going on tonight?

Q. All right. What did he say in response to that?

A. He began to tell me his account of the events, such as he arrived here with a friend, arrived at the address with a friend, and was there to get some of his tattoo equipment back. He had knocked on the door, spoke with [Victim] at the door. He stated she told him to leave.

And he said [A.M.] soon arrived after that in her vehicle, and he made the statement that [A.M.] had attacked him by pushing and shoving him. And then he said whenever he heard police arriving, because we were arriving using our lights and sirens at that point, he said he left the area.

Officer Shryer then asked Defendant questions about how A.M. attacked him and about the damage to A.M.'s vehicle. Defendant "said the damage had occurred on [A.M.]'s

---

made without [Defendant] first being advised of his constitutional rights," and "[a]ny alleged statements are the result of an unlawful arrest[.]"

13

vehicle from [A.M.] pushing him into the vehicle." Officer Shryer also asked Defendant why he "ran[,]" and Defendant "changed the statement to he did not run, but he walked away from the area." The officer also asked Defendant "why he hid from police[.]" Defendant "said he wasn't hiding from the police. He was hiding from a loose dog that was in the area chasing him." Defendant stated that "he didn't kick any door." Officer Shryer recalled that Defendant also "said, quote, if I wanted to get into the house, I would have gotten in, unquote."

After hearing argument from both sides, the trial court took the matter under advisement overnight. The following morning, the trial court overruled the motion to suppress after hearing additional argument. Defense counsel did not ask for a continuing objection to the testimony he had asked the trial court to suppress. When Officer Shryer testified before the jury about Defendant's statements, Defendant made no objection. Officer Shryer's testimony before the jury was consistent with his earlier testimony given outside their presence.

The State argues that Defendant did not preserve an objection to all of the statements complained of on appeal because the new trial motion did not include Defendant's statements denying that he kicked the house door and that "if [he] wanted to get into the house, [he] would have gotten in." That is certainly true, but there are more fundamental defects that require us to deny Defendant's second point.

First, Defendant did not object when Officer Shryer testified before the jury. Generally, "[i]n order to attack the validity of the admission of evidence to which a motion to suppress evidence was directed, the question to which the motion was directed must be kept alive by asserting a timely objection to its admission at trial and by raising the matter in

14

a motion for new trial." ***State v. McDaniel***, 236 S.W.3d 127, 130 (Mo. App. S.D. 2007). "Because a ruling on a motion to suppress is interlocutory, and thus subject to change during the trial, a specific objection must be made when the evidence is offered at trial in order to preserve the issue for appellate review." ***State v. Edwards***, 280 S.W.3d 184, 188 (Mo. App. E.D. 2009).[8]

Second, even if Defendant had objected to the evidence when it was introduced at trial (and had also specifically identified "the statements" at issue in both his motion to suppress and point relied on), the claim would still fail because a reversal is not required if the "evidence was non-prejudicial and harmless beyond a reasonable doubt." ***State v. Cook***, 67 S.W.3d 718, 724 (Mo. App. S.D. 2002). Defendant claims he was prejudiced "because the admission of these statements corroborated [Victim's] testimony that [Defendant] had been at the house on previous occasions and knew how to get into the house."[9]

The flaw in this argument is that the jury already knew Defendant had been arrested by Officer Bowling inside the same house on a previous occasion. "When evidence challenged on constitutional grounds is cumulative of other properly-admitted evidence, the

---

[8] Even though the testimony was received immediately after the suppression motion was denied by the trial court, Defendant still needed to object to the evidence to preserve the issue for review. *Cf.* ***State v. Poe***, 554 S.W.2d 564, 565 (Mo. App. St.L.D. 1977) (suppression issue not preserved for appeal where oral suppression motion was heard "out of the presence of the jury, [and] when the trial resumed before the jury defendant made no objection to the officers' testimony relating the statements"). Defendant made no request for a continuing objection, and there is no other indication in the record that the trial court and the State understood at the time the evidence was offered that Defendant would continue to object to the admission of the testimony he had previously sought to prevent. *Cf.* ***State v. Williams***, 411 S.W.3d 275, 278-79 (Mo. App. S.D. 2013) (discussing how a mutual understanding between the defendant, the trial court, and the prosecution that an objection had been preserved despite a statement of "no objection" had been demonstrated in other cases).
[9] Although Defendant does not identify which statement indicated his presence at the house on previous occasions, we presume that he is referring to his July 27, 2011 statement that he could get into the house if he "wanted to" -- arguably indicating that he had done so before. Officer Shryer also testified about other statements Defendant made after his arrest, during the ride to and while at the jail, but those statements are not addressed specifically in Defendant's point or the argument supporting it and they did not relate to his presence at Victim's house.

15

disputed evidence could not have contributed to the defendant's conviction and is harmless beyond a reasonable doubt." *State v. Lopez*, 128 S.W.3d 195, 202 (Mo. App. S.D. 2004).

Finally, Defendant's statement that "if [he] wanted to get into the house, [he] would have gotten in" did not indicate that Defendant was trying to get inside the house on July 27, 2011. In fact, Defense counsel effectively used this statement in his closing argument to convince the jury that the statement demonstrated that Defendant was *not* attempting to burglarize Victim's residence on that particular night as the jury acquitted Defendant of that particular attempted-burglary charge.[10] *Cf. Lopez*, 128 S.W.3d at 203 (holding that where the defense attorney used defendant's statements to his advantage in closing argument, and the jury convicted defendant of a lesser offense, it demonstrated that any error in admitting the evidence was harmless).

Defendant's second point also fails, and the judgment of conviction and sentence is affirmed.

DON E. BURRELL, J. - OPINION AUTHOR

NANCY STEFFEN RAHMEYER - J. - CONCURS

GARY W. LYNCH, J. - CONCURS

---

[10] In closing argument, defense counsel stated:

> [Defendant] told the detective: If I wanted to get in, I would have gotten in. That is just the truth. It's the truth. Look at the pictures. It is a single-paned window with little wood, whatever you call those, dividers. He was so strong and tough and powerful that he could dent a Cadillac Escalade -- that's one of the few cars that's still made of metal, not just plastic dent [sic] -- beat the crap out of that car, but he can't break a single-pane glass window or kick in a door? It doesn't make sense.
>
> . . . .
>
> [On] 7/27, [Defendant] did not attempt to burglarize that house. Like he said, and you all know to be true, if he wanted to get in, he would have gotten in.